528 A.2d 576

**Elizabeth O'DONNELL, Administratrix of the Estate of James H. O'Donnell Deceased, Appellee,**

v.

**WESTINGHOUSE ELECTRIC CORPORATION, Appellant,**

v.

**R.G. SMITH COMPANY, INC., Appellee.**

Supreme Court of Pennsylvania.

Argued March 13, 1987.

Decided July 2, 1987.

Frederick N. Egler, Avrum Levicoff, Egler, Anstandig, Garrett & Riley, Pittsburgh, for appellant.

Edward J. Balzarini, Sr., Balzarini, Carey & Maurizi, Pittsburgh, for Elizabeth O'Donnell, etc.

Arthur R. Gorr, Gorr Dell & Loughney, Pittsburgh, for R.G. Smith Co., Inc.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

Appellee's decedent, James H. O'Donnell, was fatally injured in his employment by R.G. Smith Co., Inc. as a painter in a Westinghouse facility. A jury trial ended in a verdict for appellee in the amount of $750,000.[1] Westinghouse's motions for judgment n.o.v. and a new trial were denied and Superior Court affirmed. 352 Pa.Super. 623, 505 A.2d 1039.

---

1. The court also assessed delay damages against Westinghouse in the amount of $148,150.88, and judgment was entered accordingly.

Westinghouse argues the trial court's refusal to charge the jury on contributory negligence was error. We agree. Because we have concluded that there *was* sufficient evidence of contributory negligence presented to warrant an instruction to the jury on that issue, we reverse and remand for a new trial.[2]

During the summer of 1979, Westinghouse contracted with R.G. Smith to paint a portion of Westinghouse's East Pittsburgh facility designated Aisle A. Due to time constraints for performance of the contract, it was not feasible to construct scaffolding. Rather, Smith elected to use overhead cranes as work platforms. One crane carried the "blow-down" crew who used compressed air guns to "blow" clean the areas to be painted. A second crane carried the painting crew who applied paint to the areas which had already been cleaned.

The overhead cranes operated on tracks mounted along the top of the walls and running the length of the aisle. Atop the crane were two catwalks which spanned the entire length of the crane from track to track. Between the catwalks were the crane trolley and motor. One catwalk was located directly above the operator's cab which hung from the underside of the crane. It was accessible through an opening in the top of the cab. In order to reach the other catwalk it was necessary to climb onto the catwalk directly above the cab, then across and around the crane machinery and finally onto the remaining catwalk.

Aisle A, where the crew was working, consists of a series of bays separated by overhead steel support beams. The support beams project downward four feet from the ceiling and are approximately sixteen feet apart. Thus, when a crane is operated along the rails, it passes below an overhead support beam approximately every sixteen feet. The clearance between the beam and the catwalk is 45½ inches,

---

2. Because of our disposition of the case on the issue of the court's charge to the jury, we need not and do not address the other question raised: whether it was error for the trial court to decide, as a matter of law, that Westinghouse had retained control of the work entrusted to R.G. Smith, so as to subject Westinghouse to the standard of care embodied in Section 414 of the Restatement (Second) of Torts.

and the clearance between the beam and handrail on the catwalk is 9½ inches. There are also light fixtures on the ceiling approximately midway between each of the support beams. The fixtures do not project downward as low as the support beams, but they are low enough that there is insufficient clearance for a man of normal size to safely stand on the catwalk as the crane passes. Thus, as the crane moves along the rails, it is necessary for a man of normal size who is on the catwalk to crouch down in order to avoid colliding with a beam or light fixture.

James O'Donnell worked on the catwalk with Nick Batouyious, blowing down dirt from the areas to be painted. These two men along with Paul Elsessner, who operated the crane, comprised the "blow down" crew. As Elsessner could not see the two men on the catwalk, he had to listen for an audible signal from them indicating that the crane could be moved. The crew agreed upon a signalling system to facilitate safe movement of the crane. According to the testimony of Nick Batouyious, the agreed upon system was for the workers on the catwalk to lower their heads and verbally indicate that they were ready for the crane to move. The crane operator would verbally verify their readiness and then ring a bell to signal the movement of the crane. After the bell sounded, the operator again verbally verified that the workers on the catwalk were ready for the movement before he actually moved the crane. The crane stopped where the men on the catwalk indicated. Then the operator rang the bell to signal the end of the movement of the crane. This system was used successfully for a day and a half before the tragic accident which resulted in James O'Donnell's death.

On the day of the accident, the "blow-down" crew had been working as outlined heretofore. After lunch, when O'Donnell and Elsessner returned to the crane, they noticed that a compressor hose, which hung from the crane, was entangled in a fence on the floor. They agreed to immediately attempt to free it. O'Donnell ascended to the catwalk over the cab. Then Elsessner moved the crane slightly to clear obstructions in order to allow O'Donnell enough room

to climb around the crane machinery to the other catwalk. Next, Elsessner sounded the bell and moved the crane to facilitate O'Donnell's attempt to free the hose. When O'Donnell was still unable to free the hose, Elsessner called to Paul Palombia, a fellow worker who was on the floor, for assistance. Palombia was also unable to free the hose, and the workers determined to move the crane again. The accident occurred during this last movement of the crane.

On direct examination, Elsessner testified about the last movement of the crane as follows:

I yelled down to Paul, don't tangle the hose. And I also yelled up to Jimmy, leave the hose alone; Paul is going to get it and try to untangle it himself. And I asked Nick to stay down; we will move the crane back a little bit.

. . . .

Then I told Paul to tell Jimmy to stay down and I yelled up for Jimmy to stay down and yelled to Nick. I said, Nick, you stay down, too. Nick answered me, and I rang the bell. Then they [sic] moved the crane backwards a little. . . .

. . . .

I heard Paul say to O'Donnell, stay down.

Then Elsessner testified about the accident:

First came to my attention when Nick went over the other side. When there was clearance he knew he could go out. You go on over and tell him, leave the hose alone and let me know when you are ready to move; I will back the crane up. Nick okayed me, and seems like as soon as I started moving the crane, Tony, Tony, stop the crane. Jimmy hit his head. So I said, What the hell you mean, Jimmy hit his head? He said it is okay to move. And Paul told Jimmy to stay down.

■ The lower courts determined that the foregoing evidence was insufficient to warrant a charge to the jury on the question of contributory negligence. In making their determination, they refused to consider evidence presented by way of a prior inconsistent statement which was used to cross-examine Elsessner, the crane operator.

Closer in time to the date of the accident, Elsessner had given deposition testimony which indicated more clearly that O'Donnell had, in fact, verbally signalled his assent to the last movement of the crane. The relevant portions of this cross-examination are as follows:

Q. "I don't know if I was in the middle of the beam or the middle of the bay. I told Palombia to untangle the hose." Is that what you said?

A. Yes, sir.

Q. "Before I started up again, O'Donnell said it was okay and Nick told me it was okay to go ahead and move the crane." That was the answer you gave?

A. Yes.

. . . .

Q. What you said here was ["B]efore I started up again O'Donnell said it was okay."] You heard O'Donnell say it was okay?

A. Yes.

. . . .

Q. You rang the bell?

A. Yes.

Q. Isn't that right?

a. Yes.

Q. That was the signal that both men should crouch down?

A. Yes.

. . . .

Q. And when O'Donnell gave you the signal and said it was okay and you rang the siren and you started to move, if he had stayed crouched down while the crane was moving, there would not have been an accident, would there?

A. It is hard to say.

Q. If he had stayed crouched down?

A. There wouldn't have been no accident, no.

The lower courts' refusals to consider this passage as substantive evidence of contributory negligence were made

in reliance on the law of evidence as it existed prior to our decision in *Commonwealth v. Brady*, 510 Pa. 123, 507 A.2d 66 (1986). In *Brady*, this Court adopted the rule that prior inconsistent statements of a non-party witness may be used as substantive evidence where the declarant is a witness at trial and available for cross-examination.[3] As the issue was properly preserved by Westinghouse when *Brady* was decided, the *Brady* rule applies and the prior inconsistent statements of Elsessner are admissible as substantive evidence, *Commonwealth v. Cabeza*, 503 Pa. 228, 469 A.2d 146 (1983).

█ In *Heffernan v. Rosser*, 419 Pa. 550, 554, 215 A.2d 655, 657 (1966), this Court reiterated the well-established principle that "where there is *any* evidence which alone would justify an inference of the disputed fact, it must go to the jury, no matter how strong or persuasive may be the countervailing proof. ..." (Footnote omitted). Reading *all* the relevant testimony together, there is certainly sufficient evidence to raise the question of O'Donnell's contributory negligence, and the trial court's refusal to charge the jury on that question was error.

Appellee argues that the evidence is too ambiguous to support a finding of contributory negligence without resort to speculation. While we agree that the evidence is ambiguous, we think that the ambiguities can properly be resolved by a jury.

First, appellee argues that the record establishes that the warning bell was used in a confusing fashion immediately prior to the accident. The testimony established that, according to well-settled procedures, one bell was sounded to signal movement of the crane, and a second bell was sounded to signal the end of movement. Noone testified specifically that, after the first movement of the crane to extricate the hose, the second bell to signal the end of movement was

3. Although this author dissented in *Commonwealth v. Brady*, 510 Pa. 123, 136, 507 A.2d 66, 73 (1986), and continues to adhere to the view that prior inconsistent statements are best left to the function of discrediting present, contrary evidence, the law in this Commonwealth is now established that prior inconsistent statements may, under certain circumstances, be admitted as substantive evidence.

sounded. However, Paul Palombia, the man on the floor, testified that when Elsessner called to him for assistance with the hose, he could see that O'Donnell was standing on the catwalk. The fact-finder might conclude either that the signal that the crane was at rest and it was safe to stand was given in accordance with the established procedures else decedent would not have stood, but noone testified to such at trial, or decedent ignored the absence of the bell signal that it was safe to stand and stood anyway. Asking the jury to resolve this question does not take it beyond the proper scope of its fact-finding function.

Appellee also argues that Elsessner's testimony *"He* said it is okay to move," cannot establish O'Donnell's assent to the movement of the crane. Elsessner testified three times on direct that he told Nick, the surviving worker, to stay down so that the crane could be moved, and twice he testified that Nick signalled that it was "okay" to move. Considering only Elsessner's direct testimony, set forth supra at 5, one would conclude that "he" referred to Nick. However, interpreting this passage in light of all the evidence, including the deposition testimony admitted on cross, "he" could properly be interpreted to refer to O'Donnell. Moreover, the fact-finding process inherently involves an infinite number of factors which are purely intangible and subjective in essence, such as the inflection in a witness's voice, apparent to a juror, but imperceptible on a printed record before us. Such may have helped to resolve the ambiguity here.

Appellee also argues that, on this record, the "okay" response attributed to O'Donnell cannot satisfy Westinghouse's burden of proof. It is true that there is an inherent ambiguity in the response "okay." However, it is undisputed that decedent was heard to say "okay" after he had been twice advised the crane would be moved again. In analyzing the problem, it is important that all the testimony be considered. This means that it is also necessary to consider the craneman's statement, "Before I started up again, O'Donnell said it was okay and Nick told me it was okay to go ahead and move the crane." This testimony indicates

more clearly that the import of decedent's "okay" was an understanding that the crane was about to move, and that he needed to take care for his own safety. Moreover, that decedent heard someone communicate the necessity to crouch down may properly be inferred from Elsessner's deposition testimony that decedent said it was "okay ... to ... move."

We are not here called upon to consider whether, as a matter of law, decedent was contributorily negligent. Rather, we are asked to consider whether there was sufficient evidence of contributory negligence to justify an instruction to the jury on that question. Drawing proper inferences from the evidence and resolving ambiguities are proper functions of the jury. The ambiguities presented in this case are capable of resolution by the fact-finder by application of common sense, drawing proper inferences from the evidence and without resort to pure conjecture. Thus, it was error for the court to refuse a general instruction on contributory negligence.

Reversed and remanded for a new trial.

PAPADAKOS, J., did not participate in the consideration or decision of this case.

LARSEN and ZAPPALA, JJ., dissent without opinion.